IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HERBERT O. RICHARD,

    Plaintiff,

v.

DEPARTMENT OF HEALTH SERVICES, SANDRIDGE SECURE TREATMENT CENTER, KITTY RHOADES, LINDA SEEMEYER, DOUG BELLILE, DEBORAH MCCULLOUGH, KEITH NESS, DANIEL ATTENBRAKER, KRISTI RICK, KEN BRANDAU, RHONDA SCHROEDER, JON OGGON, NICOLE DUCHROW, JANE DOE NURSES, and DOUG ZINKE,

    Defendants.

OPINION AND ORDER

No. 17-cv-720-wmc

Plaintiff Herbert O. Richard, a former civil detainee at Sand Ridge Secure Treatment Center ("Sand Ridge"), filed a proposed civil complaint against at least fourteen defendants, seeking to proceed on claims that they violated his constitutional and state law rights by failing to properly treat a heart condition, subsidize his medical products, prevent a broken leg, and treat his mental health needs by placing him in a different living unit at Sand Ridge. Plaintiff seeks to proceed in this lawsuit *in forma pauperis*, and thus the court must screen this complaint pursuant to 28 U.S.C. § 1915(e)(2). However, since plaintiff's complaint violates Federal Rules of Civil Procedure 8 and 20, if Richard wants to proceed with this lawsuit, he will be required to file an amended complaint that corrects the deficiencies laid out below.

1

ALLEGATIONS OF FACT[1]

Plaintiff Herbert O. Richard was involuntarily committed to Sand Ridge pursuant to Wis. Stat. § 980.06 beginning in October of 2009. Richard names as defendants two entities -- the Department of Health Services ("DHS") and Sand Ridge -- and at least a dozen individuals. The individual defendants either were working at Sand Ridge during the relevant time period or were DHS employees. The individual defendants include: former and current DHS Secretaries Kitty Rhoades and Linda Seemeyer; former and current Sand Ridge Directors Doug Bellile and Deborah McCullough; Drs. Keith Ness and Daniel Kattenbraker, directors of Sand Ridge's Health Services Unit ("HSU"); Registered Nurses Nicole Duchrow and Jane Does; Management Service Director Rhonda Schroeder; Client Rights Facilitator Kristi Rick; Buildings and Grounds Supervisor Ken Brandau; Buildings and Grounds Superintendent Jon Woggon; and Recreation Leader Doug Zinke.

Generally speaking, Richard's allegations challenge his medical care and conditions of confinement at Sand Ridge.

**A. Medical Care**

Richard suffers from a heart condition. On October 29, 2009, Richard was called to the HSU at Sand Ridge. Richard underwent an EKG and was told that everything was okay, but he later learned that that the EKG was abnormal, showing marked left axis deviation; RBBB with left anterior fascicular block; and a possible old interior infarction.

---

[1] In addressing any pro se litigant's complaint, the court must read the allegations generously, resolving ambiguities and drawing reasonable inferences in plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

Richard identifies the following defendants as being involved in his medical care: the DHS, Sand Ridge, Rhoades, Seemeyer, Bellile, McCullough, Rick, Ness Kattenbraker, Duchrow, and the Doe nurses. Richard claims that all of these defendants failed to communicate with him honestly about his EKG results, and he thus did not adjust his day-to-day choices as he should have to avoid heart problems. Here are the factual allegations underpinning this conclusion:

On October 30, 2009, Dr. Ness wrote "Disagree" on the 2009 EKG report, apparently without consulting with any other medical personnel, and without discussing the issue with Richard.

On September 23, 2012, Richard filled out a Health Service Request ("HSR"), complaining about pulling a muscle in his rib cage and hurting his back severely. He was seen in the HSU, but no one talked to him about his heart. On November 11, 2012, Richard submitted an HSR reporting difficulty breathing, and HSU took his vitals but did not refer him for further testing or care. The next day Richard resubmitted an HSR reporting continued breathing difficulty, and he alleges that Drs. Ness and Kattenbraker did not set him for an appointment immediately. Yet he did undergo an EKG on December 20, 2012, which was abnormal and showed left axis deviation, a block, and interior infarction. Again, Richard was not told that the result was abnormal or that he should modify his behavior, and no HSU staff monitored his vitals subsequently.

On May 11 and August 21, 2013, Richard underwent EKGs, which again were abnormal and showed the same issues as his previous EKGs. Again, no one gave Richard the results, advised him to modify his behavior in any way or monitored him in between

3

EKG's. Richard had another abnormal EKG on October 22, 2013, and while Dr. Ness signed the report, he never followed up with Richard about it.

More generally, Richard claims that he complained to Sand Ridge employees working in his living unit about chest pain and shortness of breath, but those employees did not always report his complaints to the HSU and sometimes outright ignored him.

On September 9, 2013, Richard requested two pillows to alleviate back and neck pain, which was approved. On January 25, 2014, Richard filled out an HSR asking that his special needs paperwork include the two-pillow approval. He received a response that "Bobby," his case manager, would see him about it at the end of February.

On April 30, 2014, Richard submitted an HSR, reporting dizziness and lightheadedness. He also reported left foot swelling and pain, and discoloration in his hands. Richard claims that this information, along with his abnormal EKGs, should have alerted HSU staff that he needed medical attention, but nothing changed. On May 27, 2014, Richard submitted an HSR, asking to speak to a doctor or nurse about being moved to the "Skilled Care" living unit, which handles patients with more serious mental health issues. Richard felt this placement was appropriate because he was in pain, felt run down and was not sleeping. However, no one assessed him at that time.

On September 26, 2014, Richard reviewed his physician orders and saw that his prescriptions did not include review dates or stop dates. This concerned Richard, since he had reported issues with his medications.

On October 14, 2014, after Richard complained about chest pains and trouble breathing, he underwent another EKG, which was abnormal and showed blockages. Nurse

Duchrow gave the EKG results to Dr. Kattenbraker, who told her he did not see any problems with the EKG. No further action was taken that day. Later in October, Richard was using a treadmill and he reported to Sand Ridge employees in his unit that he was having difficulty breathing and had pain in his upper body and jaw. However, no one took action.

On February 19, 2015, Richard suffered a heart attack. He felt chest pain while he was playing handball, so he returned to his living unit and reported the pain to unit staff, who called the HSU. Richard was taken to the HSU and reported dull pressure and heaviness, and that the pain radiated to his back and jaw. He underwent two EKGs, the second of which was done by a doctor, who ordered him to take a second nitroglycerin pill (it is unclear when the first was ordered), and sent him to the hospital via ambulance. Richard was transported to the Mile Bluff Medical Center in Mauston, Wisconsin, and then transported via Flight for Life helicopter to UW Health in Madison, Wisconsin.

Richard underwent a cardiac catheterization on February 19, 2015, and a stent was placed to address a 100% occlusion in the left anterior descending artery. The cardiac surgeons handling Richard's care informed him that he had suffered a heart attack back in October of 2014. This shocked Richard, as he had not known about any of the abnormal EKGs. Richard remained at UW Health until February 21, 2015, and during his time there it was determined that his Heart Damage Scale was 35 out of 55. Richard also learned that when his EKGs were abnormal, his health care providers should have ordered a Transthoracic Echocardiography. Richard was prescribed Cardiac Rehabilitation, Plavix, and a nitroglycerin patch.

On February 22, 2015, Richard's Sand Ridge special needs form included a note that he would receive nitroglycerin -3 tablets, from that day until January 31, 2099. That day, Richard submitted an HSR inquiring about cardiac rehabilitation, and received a response that someone was looking into it but did not yet have information. It appears Richard subsequently participated in cardiac rehab, but it was not regular or beneficial.

On March 17, 2015, Richard went back to UW Health for complaints of pain. A doctor who examined him suspected that he was suffering from atheromatous disease of the aorta with a penetrating atheromatous ulcer. It is unclear whether Richard received any treatment or medication for his pain, but he returned to Sand Ridge that day. Richard was brought back to UW Health on April 8, 2015, when he underwent a cardiac catheterization and another stent placement. Richard returned to Sand Ridge the next day, again with prescriptions for Plavix and nitroglycerin.

On April 13, 2015, Richard submitted an HSR asking when his follow-up appointment at UW Health was scheduled. He reported feeling worn out, weak and out of breath. Richard received a response that his appointment was scheduled, but no date was given. On April 20, Richard submitted a similar HSR, this time asking about cardiac therapy and rehabilitation, since he was supposed to participate in therapy and rehab three times a week but was not. An unidentified HSU staff member responded that he or she would work to fix his complaint. On April 23, Richard submitted a third HSR about his cardiac therapy, and received a response that someone would follow up with him.

On May 26, 2015, Richard returned to UW Health. Dr. Kurt Jacobson continued him on aspirin and Plavix, noting that the Plavix could be stopped in April of 2016.

On August 28, 2015, Richard submitted an HSR about his need to have three nitroglycerin pills on him at all time. Richard also raised concerns about his prior medical care, complaining that he had not learned the results of the EKGs, he was not receiving adequate gym time to rehabilitate his broken leg and staff downplayed his complaints of chest pain. Richard received a response on August 31, 2015, in which HSR staff wrote that his concerns had been forwarded to Clients Rights. On September 9, 2015, Richard sent another HSR, repeating his request for a replacement nitroglycerin pill. Richard received a response on September 10, informing Richard that he had the ability to obtain refills of the pills, but that the standard procedure was to provide him a full refill of the three tablets once all three were used. Richard claims that this response contradicts the doctor's orders.

### B. Medical Products

Richard also claims that he was inappropriately charged for necessary medical care materials. In particular, starting in January 2015, he was told he had to pay for various medications and aids that had been prescribed or recommended, including muscle rubs, fiber pills, stress balls and knee/elbow sleeves. On January 30, 2015, Richard submitted a request for a copy of any Sand Ridge policy that permitted the facility to charge patients for medications or aides prescribed to treat chronic conditions. The records department responded that there was no such policy. On February 4, 2015, Richard submitted an HSR asking for the policy that allowed Sand Ridge to charge patients for prescribed medical products. He received a response that the HSU provides "an initial supply" of

7

over the counter medication, and patients are thereafter encouraged to purchase their own items. As a result, Richard has not received various unnamed medical items that help alleviate his pain.

### C. Broken Leg

Richard also brings claims related to the conditions of his confinement against "facility safety defendants," a group of defendants that includes DHS, Sand Ridge, Rhoades, Seemeyer, Bellile, McCullough, Rick, Brandau, Schroeder, Woggon, and Zinke.

Richard alleges that as of May 25, 2015, water had been dripping onto the gym floor. While numerous complaints were made to facility staff, gym staff and client's rights and recreational leaders, no one placed a caution sign in the wet area or remediated the leaky roof issue. That day, Richard fell while playing handball in the gym because of the dripping water. At the HSU, Richard reported hearing a "pop" in his lower leg and requested x-rays, but he was not x-rayed and he did not see a doctor. Instead, HSU staff returned him to his living unit with crutches and 2 Tylenol, informing him that x-rays would be taken the next day. Richard was in extreme pain until the evening of May 26, when he underwent the x-ray and a doctor saw him. At that point, someone informed him that he had fractured his lower leg, gave him a boot and allowed him access to a wheelchair. However, when the wheelchair arrived in his living unit, Richard was told that he could only use it when he was moving out of that unit. As a result, Richard did not have a wheelchair for a majority of his activities.

8

On May 27, 2015, Richard filled out an HSR, asking about a stocking for his leg and a wheelchair. He received a response from staff indicating that he would be allowed the wheelchair for use within his living unit. In August of 2015, Richard submitted an HSR complaining about pain around his knee. While he received a response that someone would set up an appointment for him, Richard was not told the appointment date. Also in August, Richard complained that he did not have adequate time in the gym to rehabilitate his leg, but the special needs committee did not grant his request for additional time in the gym.

Richard alleges that a year later, he noted that the roof in the gym was leaking in the same area, so he filed a formal patient grievance about that area. Again, however, no one fixed the leaky roof or posted a warning sign. Instead, Richard received a response that the Buildings and Grounds Supervisor confirmed a leak in the roof.

**D. Move to Skilled Care Unit**

Between January 2017 and March 2017, Richard requested to be transferred to the "Skilled Care" living unit. Richard explains that his living unit was stressful, both physically and emotionally, and it was making him nervous and edgy. Richard further explains that his current unit's proximity to the segregation units added more stress. When Richard complained about his placement to unit staff, they directed him to Unit Manager Krause, who apparently agreed that Richard should be moved to Skilled Care, but he did not know when the move would happen. However, in March of 2017, Krause told Richard he would not be moving to the Skilled Care unit, apparently because HSU staff did not

9

approve it. Instead, Richard was moved to another living unit that was essentially the same as his previous unit. Richard alleges that this unit has caused his mental health to deteriorate.

### E. Formal Complaints

On September 23, 2015, Richard filed a formal complaint about his medical care. In particular, he complained about HSU staff's failure to properly read his EKGs and inform him of the results; the denial of his access to three nitroglycerin pills at a time; and his ignored complaints about life threatening health issues. Client Rights Facilitator, Krista Rick, handled Richard's grievance, but apparently failed to investigate his claims properly and denied his claims. Rick reported that Richard's claim that he suffered a heart attack in October 2014 could not be substantiated, but Rick did not respond specifically to Richard's complaint that no one informed him about the results of the EKGs. Richard appealed Rick's denial of his grievance, and Bellile/McCullough affirmed Rick's denial on January 11, 2016.

On May 26, 2016, Richard filed another formal complaint about the leaky gym roof. Rick's response acknowledged that the roof was leaking but apparently did not take any remediating action.

OPINION

Plaintiff's allegations can be grouped into at least four different lawsuits:

**Lawsuit #1:** Plaintiff's claims that HSU staff and supervisors failed to inform him about the results of his various EKGs, and their related failure to monitor him adequately led to his heart attack. Subsequently, HSU staff failed to give him proper access to cardiac rehab and therapy and prescribed medications.

**Lawsuit #2:** Plaintiff's claim that he had to start paying for recommended and prescribed medications in January 2015.

**Lawsuit #3:** Plaintiff's claims related to the complaints about the wet gym floor, his broken leg, and his subsequent inadequate access to the gym for rehabilitative purposes.

**Lawsuit #4:** Plaintiff's claims that his inability to transfer to the Skilled Care living unit caused his mental health to deteriorate.

All of these claims are subject to dismissal. To start, grouping these lawsuits together into one case violates Federal Rules of Civil Procedure 20 and 21. Under Rule 20, plaintiff may join their claims together in one lawsuit if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(1)(A). As the Court of the Appeals for the Seventh Circuit has stated, "[a] litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot." *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012). If a complaint includes unrelated claims against different defendants in violation of Rule 20, a court may order that the lawsuit be severed. *Lee v. Cook Cty., Illinois*, 635 F.3d 969, 971 (7th Cir. 2011); *In re High Fructose Corn Syrup Antitrust Litigation*, 361 F.3d 439, 441 (7th Cir. 2004); *Aiello v. Kingston*, 947 F.2d 834, 835 (7th Cir. 1991). Even when the claims are related, the court has authority under Rule 21 and its inherent authority to sever a lawsuit when it would be

unwieldy to allow a plaintiff to maintain so many claims against so many different defendants in a single case. *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018) ("[The federal] rules are broad, giving district courts considerable flexibility in managing and structuring civil litigation for fair and efficient resolution of complex disputes."); *Lee*, 635 F.3d at 971; *In re High Fructose Corn Syrup Antitrust Litig.*, 361 F.3d at 441.

Plaintiff's claims related to his heart condition and need for medication and those related to the slippery floor that caused his fall not only involve two completely separate set of facts, they also involve unrelated defendants. While plaintiff may believe that these two lawsuits are related because he includes Sand Ridge, DHS, Rhoades and Seemeyer as defendants to all of his claims, his allegations related to these individuals are insufficient to state a claim against them. Sand Ridge and DHS are not "persons" that may be sued under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (state agencies are not amenable to suit under § 1983); *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("A prison or department in a prison cannot be sued because it cannot accept service of the complaint."). And supervisors may be liable under 42 U.S.C. § 1983 only if they are "personally responsible for the deprivation of the constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Plaintiff's allegations do not suggest any

basis for holding these supervisory officials responsible for alleged constitutional violations that form the basis of his claims.[2]

Because plaintiff's four potential lawsuits are unrelated and involve different sets of defendants, the court is dismissing plaintiff's complaint under Rules 20 and 21, and directing him to respond to this order explaining how he wishes to proceed on his claims. Only *one* group of claims identified above may proceed under this case number. Therefore, plaintiff must decide which group of claims will proceed under this case number, and whether he wishes to proceed with any other group of claims in these proposed lawsuits. Plaintiff will be required to pay a separate filing fee for each additional lawsuit on which he chooses to proceed.

Regardless how plaintiff chooses to proceed, plaintiff must submit a new complaint that clarifies his claims. Indeed, his current complaint contains repetitive conclusory statements, and, more problematic, plaintiff often omits details about when the events actually occurred and what proposed defendants were involved in the events underlying his claims. As a result, the complaint also violates Rule 8 of the Federal Rules of Civil Procedure because it fails to provide proper notice to defendants of plaintiff's claims against them. Under Rule 8, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the complaint must provide notice to the defendants of what plaintiff believes they did to violate his rights.

---

[2] At most, plaintiff's allegations suggest that these defendants were responsible for medical care policies in general, but it would not be reasonable to infer that any of them had reason to know that any policies were causing plaintiff's EKG results to be ignored or permitted a leaky roof to be left unaddressed.

Additionally, the complaint must contain enough allegations of fact to support a claim under federal law. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

In sum, before plaintiff may proceed further with any claim, he must respond to this order by:

**(1) identifying which single lawsuit from the list above that he wishes to proceed with under this case number;**

**(2) drafting an amended complaint that complies with Rule 8 and includes only the allegations related to the single lawsuit on which plaintiff will proceed under this case number; and**

**(3) explaining whether he will proceed with any other lawsuits outlined above under new case numbers.**

Plaintiff should draft his amended complaint as if he were telling a story to someone who knows nothing about the events at hand, focusing on providing a timeline of the materials events. He should be sure to identify the specific defendants who are being sued, the specific actions taken by each defendant that plaintiff believes violated his rights and when those events took place. Plaintiff should refrain from including extraneous background information, and instead should focus on laying out the allegations in a chronological fashion. Additionally, plaintiff must be sure to include *all* of his allegations in his proposed amended complaint. After the court receives plaintiff's response, the court will screen his amended complaint and determine whether this case may proceed further.

ORDER

IT IS ORDERED that:

1) Plaintiff Herbert O. Richard's complaint is DISMISSED without prejudice under Federal Rules of Civil Procedure 8, 20 and 21.

2) Plaintiff has until **March 10, 2020,** to respond to this order as directed above.

3) For any lawsuit plaintiff dismisses voluntarily, he will not owe a filing fee and he will be permitted to refile the dismissed claims at a later date, provided that he complies with the applicable statute of limitations.

4) For any additional lawsuit plaintiff chooses to pursue, he will owe a separate filing fee.

5) Once plaintiff chooses which lawsuits he wants to pursue and files an amended complaint, the court will screen the claims to determine whether they state a claim upon which relief may be granted. If plaintiff fails to respond to this order by **March 10, 2020,** the court will dismiss his claims without prejudice for failure to prosecute.

Entered this 18th day of February, 2020.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge